STINSON v. PEPPER et al

(*Circuit Court, N. D. Illinois.* December, 1880 )

SALE UNDER TRUST-DEED—RIGHT TO REDEEM.

A bond for $32,000, given for a loan of $16,000, was secured by a deed of trust, by which the trustee was empowered to sell upon non-payment of any semi-annual installment of interest, or the sale of the land for taxes. Pending its sale in consequence of such defaults, the debtor and creditor entered into negotiations for a settlement; the latter stating that he wanted his money merely, and not the land. A written stipulation was prepared by their attorneys, and, although it was not signed by the creditor, it was understood that he would do so, and that the title would be purchased by him at the sale, and held only as security for the debt, and that the debtor would be allowed to redeem. The latter, relying upon this understanding, did not attend the sale, or procure the attendance of bidders, and the land was sold *en masse* to the creditor for $8,500, although it was divided into ten lots, and consisted of two tracts, fronting on different streets, and was worth at least $30,000. *Held,* that the debtor should be allowed to redeem.

In Equity. Bill to redeem land from a sale under a trust-deed.
*Dent & Black,* for complainant.
*Mattocks & Mason,* for defendants.

BLODGETT, J. The facts of the case, as they appear in the record, are that on the 10th day of November, 1875, defendant Pepper loaned to complainant, Stinson, the sum of $16,000, for which Stinson gave bond in the penal sum of $32,000, dated November 10, 1875, conditioned that, if Stinson should pay, or cause to be paid, to said Pepper the sum of $16,000, on the 10th day of November, 1880, with interest from date at the rate of 9 per cent. per annum, payable semi-annually, on the 16th day of May and November in each year, until the whole principal sum should be paid, then the bond should be void, otherwise to remain in full force, with a provision that, if default should be made in the payment of any interest, and any portion thereof should remain unpaid for the space of 20 days after the same became due and payable, then the principal sum, with all arrearages of interest, should, at the option of Pepper, become due and collectible at any time after such default, without notice. Coupons were also attached to said bond for the semi-annual installments of interest. To secure the payment of said bond, and the interest therein provided for, Stinson made and delivered to Charles Hitchcock, as trustee, his deed of trust, conveying the premises in question, with power to the trustee, if default should be made in payment of said principal sum, or any interest that should ac-

crue thereon, when the same became due and payable, or if Stinson should suffer the premises, or any part thereof, to be sold for any taxes or assessment whatever, to sell and dispose of said premises at auction, after publication of notice, as required by the terms of said trust-deed, and that out of the funds of said sale said trustee should pay—*First*, the expenses of said sale, and all moneys advanced for insurance, taxes, and redemptions from tax-sales; *second*, all of the principal and accrued interest thereon due on said bond. Said trust-deed also contained the usual covenants of title and against incumbrances. In order further to secure payment of said loan, Stinson executed with the said bond a letter of attorney, authorizing Charles Hitchcock, or any attorney of a court of record, to confess a judgment in any court of record for the amount due on said bond, in case of default in the payment thereof, or any interest thereon. Default was made by Stinson in the payment of the interest which fell due on the 10th day of May, 1878, which default continued more than 20 days, and Pepper declared the whole sum secured by said bond and trust-deed to be due and payable; and on the 4th day of October, 1878, the trustee, at the request of Pepper, sold the premises conveyed by the trust-deed at public auction, after having given notice of the time and place of such sale, as required by said trust-deed, the creditor Pepper being the purchaser, for the sum of $8,500, which, after deducting the cost of said sale, left the sum of $8,261.03 to apply on the said indebtedness secured by said bond. On the 16th day of September, 1878, after the alleged default in the payment of the May interest, and after the trustee had, by the request of Pepper, proceeded to advertise the property to be sold under the provision of the trust-deed, Pepper caused judgment by confession to be entered in the superior court of Cook county in his favor for the sum of $17,272, being the amount then due for principal and interest on said bond, and costs, including $60 attorney's fees for the entry of the judgment; and, since the sale under the trust-deed, the balance of said judgment, after applying the proceeds of said property, has been paid. It further appears that the sale made by the trustee was of the entire property conveyed by the trust-deed *en masse*, although it was platted and subdivided into lots, and lay in two separate tracts or parcels of lots, fronting on different streets. It also appears that at the time of the sale under the trust-deed, negotiations were pending between Stinson and Pepper for a settlement of the matter, and that Pepper had held out and insisted to Stinson, both at a personal interview and by his attorneys in that behalf, that he did not want said real estate. A few days before the sale a stipulation in writing between the parties was prepared, providing for the adjustment of the indebtedness, and the terms on which Pepper should allow Stinson to sell the property, to apply the proceeds of the sale to payment of the debt after the trustee's sale had taken place. This paper was prepared after full consultation between the attorneys of Pepper and the attorney of Stinson, and, although it was understood that it was to be sent to Pepper for his approval and signature, there can be no doubt from the proofs that Stinson and his attorney fully and in good faith ex-

pected that Pepper would approve and sign the stipulation so prepared; that the title after the then pending sale would be only held by Pepper as security for the indebtedness; and that Stinson would be allowed, on some just and equitable terms, to negotiate sales of the land, and to apply the proceeds to the extinguishment of his debt; this belief having been based mainly upon the protestations and assertions by Pepper that he did not want the land, and the assurance given by Mr. Mason, the attorney of Pepper, to Mr. Dunlevy, the attorney of Stinson, that Pepper was ready and willing to make an equitable arrangement for the redemption of the land by Stinson. The proof also shows, quite satisfactorily, that at the time of the trustee's sale the property in question was fairly worth at least $30,000, and it also appears that before the making of the trust-deed the premises had been sold at tax-sale, and that at the time of sale the redemption would expire within a month.

Relief is claimed upon several grounds: *First*, that the sale was void because made *en masse*, when the property was susceptible of division, and for greatly inadequate price; *second*, that Stinson was led to believe, from negotiations with Pepper and his attorney, that he was to be allowed to redeem the property, or apply its proceeds in payment of the indebtedness after sale; *third*, that the conduct of Pepper has been harsh and oppressive towards Stinson to such a degree as to justify the interference of a court of equity in his behalf. It will be noticed that this bill is not, like many cases where a mortgagor seeks to redeem, filed long after the sale, and after a decided rise in the selling value of the property has made it an object for him to do so; but this suit was brought so promptly after the sale that no material change in the value of the property had taken place. It may further be observed that the terms of the contract between the parties in this case, while not unusual of late years in this locality between lenders and borrowers of money, are at the same time so stringent, and place the borrowers so emphatically at the mercy of the lender in any case of accidental or unavoidable breach or default, as to make the conduct of the parties acting under this extraordinary power a special matter for the surveillance of a court of equity. There may have been, and probably was, a technical default on the part of Stinson in the payment of his May coupon, such as by the letter of the contract allowed Mr. Pepper to declare the whole debt due, and require the trustee to sell; but it is very evident to me from the proof that the complainant did not suppose, even after the forfeiture was declared and the property advertised for sale, that it was the intention of Pepper to make an absolute sale of the property, and deny Stinson the right to redeem, by the payment of the indebtedness. The protestations of Mr. Pepper that he did not want the land, that all he wanted was his money, were certainly fairly subject to the interpretation that he would gladly give up the land, if his debt was paid; and, when the sale took place, Stinson was, I have no doubt, fully impressed with the belief that the draft of the contract, which had been prepared after the consultation between the attorneys of the parties, giving him a right to redeem, or, what was equivalent thereto, to negotiate a sale of the land, and have the proceeds

applied to the payment of his indebtedness, if done within two years, would be approved and signed by Pepper; and it was only after the sale had been consummated that the intimation was given Stinson that there was any doubt of Pepper's approval of the proposed terms of adjustment. The day after the sale, Mr. Mason, Mr. Pepper's attorney, wrote Judge Dunlevy, the attorney of Stinson, what had not before been intimated, that it was doubtful whether his client would make any arrangement for a settlement, but suggesting that Stinson make a proposal for settlement much more stringent in its terms than any which had before been talked of or expected by Stinson. Stinson was at this time pecuniarily embarrassed, and unable to accept the new terms suggested. I do not think there is anything in this case tending to show that Mr. Mason, the attorney for Pepper in the matter, was guilty of any bad faith or deception towards Stinson or his attorney. It is very clear that Mr. Mason meant Judge Dunlevy to understand that the terms of any arrangement for the redemption of the property must be submitted to Mr. Pepper, and approved by him. Mr. Mason undoubtedly understood that his client wanted more security for his debt, and his letters, which are in evidence, only show that he suggested the offer of further security as the only probable condition upon which an adjustment could be obtained,— a suggestion which had not been made during the negotiations pending the sale. I have no doubt, therefore, that when this sale was made Stinson expected, and had been led by what Pepper had said to him to expect, that a right to redeem by the payment of the mortgage debt, interest, and costs would not only be recognized by Mr. Pepper, but that he would be glad to have the property redeemed; and the fact that Mr. Pepper wanted more security, which Stinson was unable or unwilling to give at that time, ought not, it seems to me, to affect the question in this case. If the security had been doubled or quadrupled, Mr. Pepper could only have got the payment of his debt out of it; and this court, if it allows a redemption, will certainly see that the indebtedness is fully paid before a redemption is consummated.

It is alleged in the bill that the mortgaged property was sold *en masse*, and this allegation is not denied in the answer, and must be taken as proved. The proof shows that the property was capable of division. It had been subdivided into 10 separate lots, each distinguished by a different number and description in a recorded plat. The lots from 5 to 9, inclusive, adjoined each other, and made, together, a tract fronting on one of the south park boulevards about 250 feet. The other lots, 21 to 25, inclusive, fronted on another avenue of the south park about the same number of feet; and the two parcels or groups of lots did not adjoin or touch each other, so that there were certainly two separate tracts. No one attended the sale, save the trustee and the agent and attorney of Mr. Pepper, owing to the fact that Stinson understood, from what had occurred in the negotiations, that the sale would not foreclose his right to the application of the property at its full, fair selling value to the payment of this debt, and he did not, therefore, attend the sale, or take measures to obtain the attendance of bidders. As I have already said, the

sale was for a price which the proof shows was far below the fair cash value of the property. It was irregular by reason of the property being offered and sold in bulk, instead of separate parcels; and Stinson in good faith believed that he was to be allowed to redeem the property. When he found the sale was to be treated as absolute, his right to redeem denied, and the collection of the unpaid balance enforced by vigorous legal proceedings, both here and in Canada, where Stinson seems to have been temporarily residing, he at once filed his bill attacking the sale.

The loan has but just matured by its terms. The bond fell due on the 10th of November, 1880, and it seems to me that, under all the special circumstances surrounding this case, it can be no hardship to Mr. Pepper to allow a redemption of his property on equitable terms. It certainly seems to me that it would be inequitable to allow Mr. Pepper to retain this valuable property for the paltry sum of $8,261, after he has collected the balance of his debt out of Stinson's other property, when he can be fully made whole for his money loaned, and disbursements in regard to it, and all substantially within the time which the original loan was to run.

It appears from the pleadings and proof that the property in question had been sold for taxes and south park assessments before the trust-deed to secure Mr. Pepper's loan was given, and that the redemption would expire within about a month after the sale took place; the amount required to redeem being about $4,000. I have no doubt that this breach of his contract on the part of Stinson provoked and annoyed Mr. Pepper exceedingly, because it not only put the title of the whole property in jeopardy, but it also required Pepper to advance a large sum of money in order to protect it; and I have no doubt that this act of negligence (to call it by no severer term) has been the chief cause of the difficulty between the parties. It is likely that if Mr. Stinson had redeemed the property, so as to fully clear up and protect the title, the default in payment of interest could have been readily condoned; but the parties got at variance, and finally went before the court to have their equities settled. On the reference to the master, it was stipulated that the inquiry before him should be solely on the question as to complainant's right to redeem, and proof was only taken on that point. The master found against the complainant, to which he excepted. This exception, for the reasons given, I shall sustain; but shall recommit the case to the master, with instructions to take proof, and report on what terms complainant shall be allowed to redeem: (1) He will ascertain and report the amount yet due and unpaid to defendant Pepper on the indebtedness secured by the bond and trust-deed, with interest thereon according to the terms of the contract. (2) The amount Mr. Pepper has paid for taxes and assessments on said property, the time of such payment, and the interest which should be allowed thereon. (3) The amount paid by Mr. Pepper to redeem or purchase the premises from any and all tax-sales.

A decree may be drawn, finding that the complainant is entitled to redeem the property.